**TRINITY UNIVERSAL INSURANCE COMPANY, Appellant,**

v.

**BILL COX CONSTRUCTION, INC. and Robert Diaz de Leon, Appellees.**

No. 04–00–00554–CV.

Court of Appeals of Texas, San Antonio.

Oct. 3, 2001.

Rehearing Overruled Jan. 23, 2002.

Daniel C. Andrews, Jones, Kurth & Andrews, P.C., Judith Ramsey Saldana, Allen, Stein & Durbin, P.C., San Antonio, for appellant.

Michael J. Black, Burns, O'Gorman, McWilliams, Black & Weyand, L.L.C., Daniel Diaz, Jr., Werstein & Associates, San Antonio, for appellees.

Sitting: PHIL HARDBERGER, Chief Justice, TOM RICKHOFF, Justice, and CATHERINE STONE, Justice.

Opinion by TOM RICKHOFF, Justice.

This is an appeal by Trinity Universal Insurance Company ("Trinity") from a summary judgment rendered in favor of appellees, Bill Cox Constructors, Inc. and Robert Diaz de Leon. The underlying case is a subrogation action arising from a fire at a building owned by Trinity's insured, Dog Team Too, Ltd. ("Dog Team"). We hold that the waiver clause contained in the contract between Dog Team and BCCI bars Trinity's subrogation claim against

BCCI and de Leon; therefore, we affirm the trial court's judgment.

## BACKGROUND

On June 13, 1997, Trinity issued an all-risk/builder's risk policy to Dog Team for renovations to its building. The policy period covered from June 13, 1997 to December 13, 1997. In October 1997, Dog Team hired BCCI as a general contractor to restore and renovate the building for use as an office and residential complex, and the parties entered into a standard form contract provided by the American Institute of Architects ("the AIA Agreement"). BCCI hired de Leon as a subcontractor. In July 1997, the Trinity policy was extended to expire on July 28, 1998. In May 1998, the building complex caught fire as a result of welding performed by de Leon.

After the fire, Dog Team and BCCI submitted claims to their insurance carriers. Dog Team carried a general liability policy, as well as the Trinity policy. BCCI carried builder's risk and general liability policies. In January 1999, Trinity informed Dog Team and BCCI that Trinity intended to assert its subrogation rights against BCCI. On January 20, 1999, Dog Team filed a "bad faith" lawsuit against Trinity. In February 1999, Dog Team and BCCI agreed to attend arbitration pursuant to the terms of the AIA Agreement; Trinity did not participate in the arbitration. Dog Team told the arbitrator that Trinity claimed subrogation rights against BCCI, but Dog Team did not assert those rights during the arbitration. Before arbitration, Trinity paid Dog Team its policy limits of $300,000.

The arbitrator determined that BCCI and de Leon were negligent and awarded Dog Team over $656,000 in damages. The arbitrator concluded that, under the AIA Agreement, Dog Team had waived all rights against BCCI for damages to the extent covered and paid by the Trinity policy. Therefore, the award included a $300,000 credit to BCCI for the insurance payment received by Dog Team from Trinity. In May 1999, the trial court adopted the arbitrator's findings and conclusions, and signed a judgment confirming the arbitration award.

Trinity filed a third-party claim against BCCI and de Leon. BCCI, de Leon, and Trinity filed cross-motions for summary judgment. The trial court rendered summary judgment in favor of BCCI and de Leon, denied Trinity's motion for summary judgment, and severed Trinity's third-party action from Dog Team's "bad faith" case. In its order on the summary judgment and severance, the trial court found that "Article 17.6 of the contract between [Dog Team] and [BCCI] waived [Trinity's] subrogation claims."

## WAIVER OF SUBROGATION RIGHTS

■■■ Trinity's right to subrogation derives from the rights of Dog Team, and is limited to those rights. *Guillot v. Hix*, 838 S.W.2d 230, 232 (Tex.1992). Subrogation rights may be waived or altered by contract. *Lancer Corp. v. Murillo*, 909 S.W.2d 122, 127 (Tex.App.—San Antonio 1995, no writ). BCCI was not a party to the insurance contract between Dog Team and Trinity; thus, BCCI must look to its own contract with Dog Team to determine what subrogation rights it may insist that Dog Team require its insurers to waive. *See Ken Petroleum Corp. v. Questor Drilling Corp.*, 24 S.W.3d 344, 355 (Tex.2000).

The agreements between the parties contemplated that each would obtain the appropriate levels of insurance. The AIA Agreement provides in part:

**Section 17.1** The Contractor shall purchase from and maintain ... insurance for protection from claims ... for dam-

ages, other than to the Work itself, to property which may arise out of or result from the Contractor's operations under the contract, whether such operations by the contractor or by a Subcontractor or anyone directly or indirectly employed by any of them . . . . .

**Section 17.3** Unless otherwise provided, the Owner shall purchase and maintain . . . property insurance upon the entire Work at the site to the full insurable value thereof. This insurance shall be on an all-risk policy form and shall include the interests of the Owner, the Contractor, Subcontractors and Sub-subcontractors in the Work and shall insure against the perils of fire and extended coverage and physical loss or damage including, without duplication of coverage, theft, vandalism and malicious mischief.

The AIA Agreement defines "Work" to mean "the construction and services required by the Contract Documents, whether completed or partially completed, and includes all other labor, materials, equipment and services provided or to be provided by the Contractor to fulfill the contractor's obligations. The Work may constitute the whole or a part of the Project." The Outline Specifications also require the contractor to obtain insurance:

The Contractor shall obtain, at his expense, Builder's Risk Insurance against the perils of fire . . . in the amount of insurance equal at all times to the insurable value of materials delivered and labor performed . . . . .

The AIA Agreement contains the following waiver clause:

**Section 17.6** The Owner and Contractor waive all rights against each other and the Architect, Architect's consultants, separate contractors described in Article 12, if any, and any of their subcontractors, sub-subcontractors, agents and employees, for damages caused by fire or other perils to the extent covered by insurance obtained pursuant to this Article 17 or any other property insurance applicable to the Work, except such rights as they may have to the proceeds of such insurance held by the Owner as fiduciary. The Contractor shall require similar waivers in favor of the Owner and Contractor by Subcontractors and Sub-subcontractors. The Owner shall require similar waivers in favor of the Owner and Contractor by the Architect, Architect's consultants, separate contractors described in Article 12, if any, and the subcontractors, sub-subcontractors, agents and employees of any of them.

BCCI contends the Trinity policy was purchased pursuant to Article 17 and is applicable to the Work. Trinity contends its policy was not purchased pursuant to Article 17, its policy is not applicable to the Work, and, in any event, the waiver is not effective against it because it was not given notice of the waiver-of-subrogation clause. We construe the parties' arguments as presenting three issues for our consideration: first, is Section 17.6 ineffective against Trinity because it was not notified of the waiver; second, if effective, does Section 17.6 operate to waive Trinity's subrogation claims; and third, was the Trinity policy applicable to the Work.

### NOTIFICATION OF WAIVER

The AIA Agreement did not require the parties to notify their respective insurance carriers of the mutual waivers, and Trinity's summary judgment evidence established that it was not notified its subrogation rights were waived under the terms of Article 17.6 until after the fire. Therefore, Trinity asserts the waiver clause was ineffective because it was not aware of the waiver.

■ Trinity relies on *Seamless Floors by Ford, Inc. v. Value Line Homes, Inc.,* 438 S.W.2d 598, 601–02 (Tex.Civ.App.—Fort Worth 1969, writ ref'd n.r.e.), which held that the waiver of subrogation rights was not effective against an insurance carrier that was not aware of the contract between its insured and another that provided for such a waiver. However, the *Seamless Floors* opinion does not discuss the language of the insurance contract. Here, the Trinity policy contained the following standard "Transfer of Rights of Recovery Against Others to Us" clause: "If any person or organization to or for whom we make payment under this insurance has rights to recover damages from another, those rights are transferred to us to the extent of our payment. That person or organization must do everything necessary to secure our rights and must do nothing *after* 'loss' to impair them." (Emphasis added.)

■ An insurer's right to subrogation arises when the insured has a cause of action against the defendant. *Interstate Fire Ins. Co. v. First Tape, Inc.,* 817 S.W.2d 142, 145 (Tex.App.—Houston [1st Dist.] 1991, writ denied). Under the AIA Agreement, Dog Team and BCCI contracted against liability, each to the other, to the extent of compensation of loss by insurance. The general rule is that a release between the insured and the offending party prior to the loss destroys the insurance company's rights by way of subrogation. *National Union Fire Ins. Co. of Pittsburgh, Pa. v. John Zink Co.,* 972 S.W.2d 839, 844 (Tex.App.—Corpus Christi 1998, writ denied); *Interstate Fire,* 817 S.W.2d at 145; *see also* 16 COUCH ON INSURANCE § 224.76 (3d ed.2000) (because an essential element of subrogation is that the insured have a viable claim against a third party, the insured's enforceable preloss release of any right to hold a particular party responsible for damages effectively prevents the insurer's subrogation rights from ever arising upon its payment of that loss to the insured). "Such pre-loss waivers fully comport with the many policies which explicitly specify that the insured shall do nothing 'after the loss' to prejudice the insurer's subrogation rights." 16 COUCH ON INSURANCE § 224.76. Here, the "Transfer of Rights" clause did not preserve Trinity's subrogation rights from being impaired after loss. *See also Continental Casualty Co. v. Homontowski,* 181 Wis.2d 129, 510 N.W.2d 743, 746 (1993) (refusing to relieve insurer of disadvantageous contractual terms where "rather than drafting a contract that prohibited [its insured] from impairing its subrogation rights at any time, Continental Casualty required [its insured] to secure its rights and do nothing to impair those rights after a loss occurred."). The *Continental Casualty* court noted that if the insurance contract had prohibited the insured from impairing its subrogation rights at any time, such would have been sufficient to preserve the insurer's right of subrogation. *Id.*

We may not rewrite the contract between the parties. We do not agree with Trinity that the "Transfer of Rights" clause, which referred explicitly to conduct by the tortfeasor after loss, would by general language afford it protection from a waiver prior to loss. An explicit clause to protect Trinity's right of subrogation at all times could have been included in the policy. The most that can be said in favor of Trinity's position is that the "Transfer of Rights" clause is ambiguous, but ambiguity must be construed in favor of the insured. *See National Union Fire Ins. Co. v. Hudson Energy Co.,* 811 S.W.2d 552, 555 (Tex.1991).

Nor can Trinity accept that part of a contract beneficial to it and deny the appli-

cation of other provisions that may be detrimental or disadvantageous. *Daniel v. Goesl,* 161 Tex. 490, 341 S.W.2d 892, 895 (1960) (one who accepts the benefit of a contract must also assume its burdens); *see also RGS, Cardox Recovery, Inc. v. Dorchester Enhanced Recovery, Co.,* 700 S.W.2d 635, 639 (Tex.App.—Corpus Christi 1985, writ ref'd n.r.e.) (holding that parties to joint venture had right to place whatever limitations upon themselves as they might agree to in their contract and that the provision might be burdensome or awkward is not a problem for the courts; appellants agreed to the provision and appellees have the right to rely on compliance with the provision as agreed to by the parties). The Trinity policy prohibited Dog Team from impairing Trinity's subrogation rights after incurring a loss; the policy did not preserve Trinity's subrogation rights before a loss. The AIA Agreement, with its waiver-of-subrogation clause, was executed before the fire and is, therefore, effective against Trinity if the clause is applicable under these circumstances. We next consider whether the waiver-of-subrogation clause in Article 17.6 applies.

## WAIVER OF SUBROGATION RIGHTS

■ Courts addressing similar AIA contracts agree that the contract bars the owner, or its subrogee insurance company, from bringing suit against either general contractors or subcontractors for damages caused by fire or other peril. However, the courts disagree as to the scope of the waiver. A review of cases from other jurisdictions involving language identical to or substantially similar to the language in the AIA Agreement here reveals two approaches to the question of when an insurer's subrogation rights are barred: one approach makes a distinction between Work (as that word is defined in the contract) and non-Work property and limits

the scope of the waiver to damages to the Work; and the second approach draws no distinction between Work and non-Work, but instead, limits the scope of the waiver to the proceeds of the insurance provided under the contract between the owner and contractor.

The courts that interpret the scope of the waiver by drawing a distinction between Work and non-Work property ask only whether the Work was damaged—if yes, then the waiver applies; if no, then the waiver does not apply. *See Fidelity & Guar. Ins. Co. v. Craig–Wilkinson, Inc.,* 948 F.Supp. 608, 611 (S.D.Miss.1996), *aff'd,* 101 F.3d 699 (5th Cir.1996) (plaintiff's claim for damage to non-work property not barred because contractual waiver provided solely for waiver of claims for damage to Work); *Town of Silverton v. Phoenix Heat Source Sys., Inc.,* 948 P.2d 9, 12 (Colo.Ct.App.1997) (waiver limited to value of work performed under contract and inapplicable to other parts of town hall damaged by fire); *S.S.D.W. Co. v. Brisk Waterproofing Co.,* 76 N.Y.2d 228, 557 N.Y.S.2d 290, 292–93, 556 N.E.2d 1097 (1990) (waiver applies only to damage to areas within the limits of the Work). Under this interpretation, "It makes no difference whether the policy under which subrogation is sought is one which the owner purchased specifically to insure the Work pursuant to [the contract] or some other policy covering the owner's property in which the owner has also provided coverage for the Work. In either event, the waiver clause, if given its plain meaning, bars subrogation only for those damages covered by insurance which the owner has provided to meet the requirement of protecting the contractor's limited interest in the building-*i.e.,* damages to the Work itself." *S.S.D.W.,* 557 N.Y.S.2d at 292–93, 556 N.E.2d 1097.

However, the majority of jurisdictions considering the issue criticize the work/non-work distinction as ignoring the language defining the scope of claims falling within the waiver clause. These courts interpret the scope of the waiver as limited to the proceeds of the insurance provided under the contract, and ask whether the owner's policy was broad enough to cover both Work and non-Work property and whether the policy paid for damages. *ASIC II Ltd. v. Stonhard, Inc.*, 63 F.Supp.2d 85, 92 (D.Me.1999) (waiver clause did not restrict waiver of damages to Work but to proceeds of any insurance provided under the contract); *Employers Mut. Cas. Co. v. A.C.C.T., Inc.*, 580 N.W.2d 490, 493 (Minn.1998) (if owner relies on an existing policy broad enough to cover the Work and the non-Work property, it waives right to sue for all damages so long as that damage is covered by the policy); *Lloyd's Underwriters v. Craig and Rush, Inc.*, 26 Cal.App.4th 1194, 32 Cal.Rptr.2d 144, 146, 148 (1994) (waiver limited by the coverage afforded by the identified policy and not by the nature of the structure harmed); *Haemonetics Corp. v. Brophy & Phillips Co.*, 23 Mass.App.Ct. 254, 501 N.E.2d 524, 526 (1986) (waiver of rights extends to proceeds of any insurance provided under the contract). "The plain import of the emphasized language is that so long as a policy of insurance 'applicable to the Work' pays for the damage, the waiver applies.... The waived claims are not defined by what property is harmed (*i.e.,*

'any injury to the Work'); instead, the scope of waived claims is delimited by the source of any insurance proceeds paying for the loss (*i.e.,* whether the loss was paid by a policy 'applicable to the Work')." *Lloyd's Underwriters*, 32 Cal.Rptr.2d at 148; *see also ASIC II Ltd.*, 63 F.Supp.2d at 92–93 (explaining that waiver form used in *S.S.D.W.* contract was later revised to overcome the holding in this case); *A.C.C.T., Inc.*, 580 N.W.2d at 493 (adopting reasoning of *Lloyd's Underwriters*); *Haemonetics*, 501 N.E.2d at 526.

One Texas court [1] has analyzed the same language in an AIA Agreement, although without discussing the two approaches. *See Temple EasTex, Inc. v. Old Orchard Creek Partners, Ltd.*, 848 S.W.2d 724 (Tex. App.—Dallas 1992, writ denied). The Dallas court of appeals held as follows:

Section 11.3.6 of the contract operates as a waiver as to all rights of the owner and contractor against the subcontractors for damages caused by fire or other perils *to the extent that such damages are covered by insurance obtained pursuant to section 11.3.1.* Section 11.3.1 places an affirmative duty upon the owner to procure property insurance that covers the interests of the owner, the contractor, and the subcontractors. If the owner fails to purchase adequate insurance and fails to notify the contractor that the project is underinsured, the owner bears the risk of loss to the extent that damages are not covered by insurance. The policy underlying these

---

1. Recently, the Austin Court of Appeals considered a case involving identical language. *See Eslon Thermoplastics v. Dynamic Sys., Inc.*, No. 03–00–00501–CV, 2001 WL 726359 (Tex.App.—Austin June 29, 2001, n.p.h.). In the first issue on appeal, appellants argued that the waiver did not apply, and, even if it did apply, the waiver foreclosed only those claims for damage to the building and not damage to machinery or equipment. The appellee countered that the damaged equipment

was part of the building, and, in any event, the court did not need to address the work/non-work distinction because the equipment had been incorporated into the construction. The appellate court agreed with the appellee that the equipment was part of the "work" and, without further discussion, overruled the first issue. Because the *Eslon* opinion did not analyze the two approaches, its conclusion that the waiver applied because the equipment was part of the Work is not persuasive.

clauses is to avoid disruption and disputes among the parties to the project. The need for lawsuits between the parties is eliminated because all contracting parties are protected from property loss under the owner's property insurance.

Under section 11.3.6 of the construction contract, Old Orchard and Greener & Sumner waived all rights against each other, the subcontractors, sub-subcontractors, agents, and employees of each other for damages caused by fire or other perils *to the extent that the damages were covered by insurance*....

848 S.W.2d at 730–31 (emphasis added, citations omitted).

We find the reasoning adopted by the majority of jurisdictions addressing this issue to be persuasive and adopt it in resolution of this case. We hold that waived claims are not defined by what property is harmed (*i.e.*, "any injury to the Work"); but rather, are limited by the *source of any insurance proceeds paying* for the loss (*i.e.*, whether the loss was paid by a policy "applicable to the Work"). Our holding is supported by the policy considerations expressed by the *Temple EasTex* court and by Judge Alexander in his *S.S.D.W.* dissent, in which he stated:

The majority holds today that the subrogation waiver clause in this standard American Institute of Architects (AIA) form contract does not bar the owner's insurer from seeking recovery from the contractor for property damage to the owner's building so long as the damage is not to the actual work to be performed under the contract. This limited construction of the subrogation waiver clause ... undermines the very purpose of the clause. Rather than promoting certainty as to the liability of the parties to these standard contracts, the majority's construction of this standard waiver clause invites litigation as to whether the

damages in any particular case fall within the scope of the work to be performed under the contract. In my view, a construction of the clause to bar the owner from seeking all damages as to which it has obtained insurance under the contract, thereby barring any subrogation action by the owner's insurer, best effectuates the intent of the parties to the contract....

. . .

[T]hese subrogation waiver clauses are intended to avoid litigation over claims for damages while also protecting the parties by "in effect simply requir[ing] one of the parties to the contract to provide insurance for all of the parties." Here, it is the owner who was required to insure against damage to the building and to waive all claims against the contractor for losses covered by that insurance. I agree with those courts holding that in these circumstances the parties have agreed that the owner's recovery for these losses is limited to its insurance proceeds and neither the owner, nor its insurer (as subrogee) has any cause of action against the contractor.

. . .

... The limited construction of the subrogation waiver clause adopted by the majority today requires further litigation, and perhaps a trial, to determine the extent to which the damages suffered by plaintiff was related to that Work. In my view, this construction leaves the contractor's liability uncertain in every case and thus completely undermines the purpose of the subrogation waiver clause....

557 N.Y.S.2d at 295–97, 556 N.E.2d 1097 (Alexander, J., dissenting); *see also Lloyd's Underwriters,* 32 Cal.Rptr.2d at 148 (court rejected approach adopted by *S.S.D.W.* majority, concluding the New York court ignored the fact that the waiver

provision defined waived claims not by what property was damaged but by which policy provided indemnification against the loss).

■ The AIA Agreement here defined the waived claims by the source of insurance proceeds, not the property damaged: "[Dog Team and BCCI] waive all rights against each other . . . for damages caused by fire . . . *to the extent covered by insurance* obtained pursuant to this Article 17 or *any other property insurance* applicable to the Work." (Emphasis added.) Therefore, it is of no consequence whether the damage was to Work or to non-Work property. As long as a policy of insurance "applicable to the Work" paid for Dog Team's damages, the waiver applies. Therefore, the remaining issue is whether the Trinity policy is "applicable to the Work."

## INSURANCE APPLICABLE TO THE WORK

■ The parties agree that the waiver applies to either insurance obtained pursuant to Article 17 or other property insurance applicable to the Work. Trinity asserts Article 17 was modified by the Outline Specifications, so that the Trinity policy was not obtained pursuant to Article 17, leaving only the possibility that the Trinity policy is "insurance applicable to the Work." Trinity contends that its policy is not applicable to the Work because BCCI was obligated to obtain insurance for the Work, not Dog Team; and the Trinity policy obtained by Dog Team prior to the execution of the AIA Agreement covered only Dog Team's previous work. There is no dispute that Dog Team did not purchase a separate insurance policy with coverage limited to the Work; therefore, we agree that the Trinity policy was not obtained pursuant to Article 17. However, because Dog Team relied on the Trinity

policy, the issue is whether that policy qualifies as "any other property insurance applicable to the Work."

The majority of jurisdictions interpreting the clause "any other property insurance applicable to the Work" have ruled that an existing policy is broad enough to cover both Work and non-Work property and the owner waives the right to sue for any damages suffered as long as the damage is covered by the policy. *Lloyd's Underwriters,* 26 Cal.App.4th 1194, 32 Cal. Rptr.2d 144 (owner relied on preexisting insurance to satisfy AIA contractual obligations); *ASIC II Ltd.,* 63 F.Supp.2d at 92–93 (finding no compelling distinction between an insurance policy actually procured at the time of the contract, and an existing all-risk policy that meets the insurance procurement requirements of the contract in the first instance); *Haemonetics,* 501 N.E.2d at 526 (court decided it need not address the issue of the scope of the owner's obligation to acquire insurance for the contractor's benefit because it determined that the waiver applied regardless of that scope). As the *A.C.C.T., Inc.* court explained,

The waiver clause waives the right to sue for any damage "to the extent covered by property insurance obtained pursuant to this Article 17 or any other property insurance applicable to the Work." When reading that in conjunction with the insurance requirement imposed upon the owner—which states that "[u]nless otherwise provided, the Owner [must] purchase . . . property insurance upon the entire Work at the site to the full insurable value thereof"—the meaning of these provisions seems clear.

The owner has the option of purchasing an all-risk policy specifically to cover the "work" or can rely on any existing property insurance which would cover the "work." However, the waiver clause

creates the "work" and "nonwork" distinction based upon the owner's decision to purchase a new policy or to rely upon an existing one. The owner agrees to waive the right to sue for damages done only to the "work" if it purchases a separate all-risk policy specifically to cover the "work." But if the owner relies on an existing policy which is so broad that it covers both "work" and "nonwork" property, it waives the right to sue for all damages done as long as that damage is covered by the policy. 580 N.W.2d at 493 (citing to majority of jurisdictions that have ruled on this issue consistent with this holding).

■ We hold that the only logical interpretation of the clause "any other property insurance applicable to the Work" is that the clause refers to insurance applicable to the location of the work or the building containing the work as that is the type of insurance contemplated by Article 17.6. Trinity does not assert Dog Team's damages were not covered by the policy; it merely asserts it is entitled to subrogation from BCCI because BCCI was liable for the damages. Even viewing the evidence in the light most favorable to Trinity and disregarding all contrary evidence and inferences, there is no dispute that Dog Team relied on the Trinity policy to provide coverage for its losses arising from damage to the property following the fire. Because the damages suffered by Dog Team due to the fire were covered by the Trinity policy, the policy constitutes "other property insurance applicable to the Work."

## CONCLUSION

Dog Team's claim against BCCI was barred to the extent those damages were covered by an insurance policy—a fact recognized by the arbitrator's conclusion that the award to Dog Team be reduced by the amount Dog Team received from Trinity. Therefore, under Article 17.6 of the AIA Agreement, Trinity had no right of subrogation. *See Ortiz v. Great Southern Fire & Cas. Ins. Co.*, 597 S.W.2d 342, 343 (Tex. 1980) (one reason for granting an insurance company the right of subrogation is to prevent the insured from receiving a double recovery).

We affirm the summary judgment in favor of BCCI and de Leon.